## SMITH v. THE STATE.

Where one is indicted jointly with others for murder, and it appears upon the trial that there was an actual homicide committed by another of the defendants than the one on trial, it is not competent, under that indictment, to convict the defendant on trial of a separate and independent "assault with intent to murder," which he may have committed upon the person slain, immediately before the firing of the fatal shot, with which he was in no wise connected. It follows that in such a case it is erroneous for the court to so charge the jury as to authorize a conviction of assault with intent to murder, independently of his participation in the particular criminal design which resulted in the death of the person slain.

Argued October 15, 1906. — Decided January 15, 1907.

Indictment for murder. Before Judge Martin. Pulaski superior court. June 21, 1906.

Grant Smith, Hardy Moss, Carroll Daniel, and Monroe Smith were indicted for the murder of Will Gilbert, by shooting him with guns and pistols. Grant Smith was tried separately, and was convicted of assault with intent to murder. His motion for a new trial was overruled, and he excepted. Two witnesses testified on the trial. One of them testified, that he saw Gilbert after the shooting, and found that he was shot in two places; that a pistol ball had shot through his arm, and he had a large gunshot wound in the thigh; and that he bled to death from the wound in the thigh. The other witness testified: "Will Gilbert was killed by Grant Smith, Carroll Daniel, and Hardy Moss shooting him. He was killed by a load of shot from a single-barrel shotgun which was fired one time by Hardy Moss. It hit Gilbert on the inner side of the thigh, making a hole big enough to put a hen egg in. Hardy was about ten steps off from Will, and the shot hit in a kind of wad. . . When Hardy shot him, Will kind of tried to hobble off down the cotton row, and Monroe Smith threw up his pistol and tried to shoot, and a whole crowd of women there in the piazza threw up their hands and said, 'Kill him, kill him, God damn him! kill him.' Grant Smith, the defendant on trial, was about two steps from Moss when Moss shot Gilbert. Monroe Smith was also about two steps down below him. Carroll Daniel was also about two steps from him, standing right behind his shoulder. Moss was standing down below, to the side of Grant, when the shooting of the shotgun was done by Moss. Moss was between Grant and the house when Moss shot. Grant Smith and Gilbert, the deceased, were standing in the path, facing each other, and Hardy was standing below Grant. Moss was standing to the side of Grant, but farther away from Gilbert than Grant was. Grant Smith was not standing between Moss and Gilbert. This thing happened at a mullet supper that Henry Hudson was giving. I was out in the yard and heard them fussing in the house. I don't know what the row was about. I ran in the house and found Monroe Smith, Grant Smith, and Carroll Daniel had Gilbert surrounded; looked like they were cursing at one another. Hudson was trying to stop the fuss. When I went in I says, 'Boys, don't have any fuss. If you won't have any fuss I will carry Will off from here.' I took this hand. I run

between Grant and Carroll and pulled Will out and started off with him. When I got out the door I looked back and saw Grant and Carroll Daniel following. Hardy Moss was lying in the piazza with the shotgun. Grant Smith, Monroe, and Carroll seemed to be angry at Gilbert when in the house, and were cursing at him in there. I had started to carry Gilbert home, and had got about 35 yards from the house, in the cotton patch. We were going along in the path that leads through the cotton patch. I can't remember seeing anybody with me when I was taking Gilbert out. But Jim King was there; he was standing right at Gilbert when he was shot. Grant says, 'Will, you ain't the only God damn man here.' But I never did hear Grant say what Will had done. Grant kept telling Will he wasn't the only God damn man there, but he never said what Gilbert had done. Will said, 'What have I done to you boys?' But Grant never said what. Grant had his pistol in the bosom of his overalls. I looked around and saw Grant pull it out. Will swung around and I turned him loose. At that time Grant cracked down and fired, bang, bang, like that. Grant shot first and shot at Will Gilbert. They were about eight steps apart when these shots were made. As near as I could come at it, it was Grant who drew the pistol first. His was the first one I saw. Gilbert was not doing anything when Grant fired at him. He returned the fire at once. . . Then Carroll Daniel shot right behind Gilbert. When Carroll shot I saw Gilbert weaken. Then next Hardy Moss shot one time with his shotgun. Then Monroe Smith shot at Gilbert with a pistol. Then several more shot. I could see the light of the pistols, but could not tell who shot. Monroe Smith shot at Gilbert after Gilbert had turned to run. All those shots fired right fast along, one right after the other. . . Hardy Moss, Monroe Smith, and Grant Smith were all pretty close together at the time of the shooting. They did not all come out of the house together; that is, I didn't see them. When Grant Smith, Carroll Daniel, and Monroe Smith came out of the house, Grant and Carroll came right on. I didn't know Hardy was there till I turned and Hardy threw up his gun and shot. . . (On cross-examination) I was out in the yard and heard a row and fuss going on in the inside. I recognized Gilbert's voice from within. . . I ran in. . . . Everybody inside seemed to be mad. Grant, Carroll, and Monroe Smith had Gilbert surrounded. I didn't see any other

people about him. Will was cursing. Grant said, 'Will, you ain't the only God damn man there is here.' Hardy Moss had nothing to do with any of this. He was out on the porch. When I passed with Will, Hardy was lying on the porch. None of the boys spoke to him when they came by. Hardy spoke to none of them. There had not a word passed between any of these four joint defendants that night that I know of. Hardy had not been in the house at all that night that I know of. There had not been any other row or quarrel before of any sort that night between anybody that I knew of. After I got Will out of the house he told me he had not hit any woman over the head with a pistol. Hardy must have come behind the other boys, because they had all passed him lying on the porch. I did not see Hardy at all until he threw up his gun and shot. Hardy came up from toward the house, in the path we all had come, and came up to Grant, about two steps from Grant. Grant and Will fired at one another. Grant fired a second or two ahead of Will. Grant did not hit Will, but Will's shot hit Grant. After Will hit Grant he kept on firing; he fired twice, I think. . . Nobody was between Moss and Grant, and Grant could have seen Moss while he (Grant) was firing at Will."

The State introduced a verdict of guilty as to Hardy Moss upon the indictment under which Grant Smith was being tried.

The motion for a new trial was on the grounds, that the verdict was contrary to law and to the evidence, and without sufficient evidence to sustain it; that the court erred in admitting in evidence the verdict against Hardy Moss, over the objection of the defendant, that the opinion of another jury as to the guilt of Hardy Moss was not admissible; and that the court erred in certain instructions to the jury. Some of these instructions are set out in the following opinion. The others are as follows: (3d ground) "I charge you that the principle of law is that where persons conspire together to commit a crime, and are present countenancing or aiding and abetting, the act of one would be the act of all." (4) "If you believe, under the evidence in this case and under the law charged you relative to murder, that the defendant now on trial himself was guilty of murder, was the actual perpetrator, and that he was guilty of murder beyond a reasonable doubt, then it would be your duty to so find." It is alleged that there was no evidence on which to base these instructions. (5) "Or if you believe from the evidence

in the case that he was not the actual perpetrator, if there was a killing, . . but was there aiding and abetting, or was there present and had a common intent,—joined in the common intent of the perpetrator, the man who really did the killing, then, if you believe that beyond a reasonable doubt, you would be authorized to find him guilty of murder." It is alleged that this was error, because, before the defendant could be convicted of any crime involving unlawful homicide, it was necessary to prove not only a killing, but an unlawful killing; and before he could be convicted of murder, the killing must not only have been unlawful, but malicious; also, that this instruction was error, because it expressed an opinion not only that the killing was criminally done, but that it was to be graded as murder. (6) "I have charged you the law on murder and voluntary manslaughter, and if you believe from the evidence in this case that the defendant on trial was not the actual perpetrator; that is, was not the one who did the killing, if you should find that there was a killing done, but was there aiding and abetting the one who did, and joined in the common intent, then, as I have charged you before, he would be guilty, and I have charged you the law relative to murder and manslaughter in order that you may determine under the law and the evidence in this case—because you are the judges of the law and its application to the evidence when I give it to you—that you may determine whether or not the defendant now on trial was the principal in the second degree, you would have to find from the evidence in the case, and under the law, that the actual perpetrator would have been guilty of the offense before—if you believe it has been shown that some other person was the actual perpetrator, did the killing—you would have to believe that he was guilty of either murder or voluntary manslaughter before you could find the defendant on trial guilty, if you believe that he was a principal in the second degree, and not a principal in the first degree." It is alleged that this was error, because it instructed the jury that they would be authorized to find the defendant guilty if they should find that there was a killing; and because it is vague, contradictory, confusing and misleading. (7) "If you believe from the evidence in this case that the defendant and the deceased engaged in a mutual combat, that there was a mutual intent to fight, then you may apply the principles of law as enunciated in section 73 of the Criminal Code"

(reading that section). It is alleged that this was error because it was the character of the killing by Hardy Moss that determined the defendant's guilt, and there was no evidence of mutual combat between Moss and the deceased. (8) "It will be noted that in the case of mutual combat the slayer must have repented and in good faith endeavored to decline any further struggle, and that it was absolutely necessary at the time of the killing to save his own life, before he would be justified." It is alleged that this was error, because repentance and an endeavor to decline any further struggle is only incumbent on the slayer when he is the aggressor. The 9th, 10th, 12th, and 13th grounds relate to instructions on assault with intent to murder and shooting at another; in which, it is alleged, the court erred because there was no evidence on which to base them.

*Fort & Grice,* for plaintiff in error.

*E. D. Graham, solicitor-general,* contra.

ATKINSON, J. This case should not be confused with the proposition that an indictment for the greater will authorize a conviction for a less offense, where the averments in the indictment are sufficiently broad, as was held in *Smith* v. *State,* 126 *Ga.* 544. That is not the question. We are confronted with a different proposition altogether. The defendant was on trial under an indictment which charged him and others with a criminal design to take the life of the person slain. Evidence was introduced tending to show that the defendant unlawfully shot at the person slain, with a pistol, and his fire was returned by the person assailed, and that at this instant one of the other defendants indicted, but not on trial, fired upon the deceased, inflicting the mortal wound. Under such evidence and under such indictment the court charged the jury as follows: "If you should believe from the evidence in this case that the defendant now on trial was not a principal, either in the first or second degree, under the rules that I have already given you in charge, and you should further believe from the evidence in the case that he acted independently and separately, and if you believe that he committed an assault upon the party who was killed, and that he committed that with the intent at the time he committed the assault,—with intent to kill with some deadly weapon, and that he intended to kill, then you may find him guilty of the offense of assault with intent to murder; but if that intent

did not exist, it would not have been murder if death had resulted. If you believe that the defendant fired at the deceased and that he did not kill him, and you believe that if he had killed him, under the rules of law that I have given you heretofore in charge, that it would have been murder if death had resulted, if you believe he would have been guilty of murder under those circumstances, you would be authorized to find the defendant guilty of assault with intent to murder." The exception to this charge was that "it instructed the jury that in a case where joint defendants were jointly indicted for a joint crime involving the unlawful and malicious taking of human life, and where it appears that one of the joint defendants did in fact take the life of the deceased, they could find another of these joint defendants, who did not do the killing, guilty of an entirely independent and separate act from that for which he was indicted. Under the charge in the indictment, in the light of the evidence this defendant could not possibly have been convicted of an offense which did not involve the unlawful taking of human life. The harm of this charge is manifested by the verdict finding the defendant guilty of assault with intent to murder."

We do not think this charge was authorized. The indictment charged the defendant with a particular criminal act, to wit, the act which actually resulted in the death of the deceased, and in which there were other criminal participants. It would not be proper to put the defendant on trial for that particular offense and convict him of any offense based upon a separate and distinct or an entirely different act. For illustration, let us suppose that, with an intent to murder by the unlawful homicide of another, one makes a deadly assault upon such other in the morning and fails of his purpose. Let us suppose that the intending slayer should during the day have completely repented of his deadly purpose, yet in the afternoon should form another purpose to kill, and lie in wait and actually slay the person who had escaped unharmed in the morning. Here is the effort upon two separate occasions to bring about the death of the same person, and yet in legal contemplation it could not have been two attempts to commit the same murder. There could be but one murder, and therefore the previous attempt could not be held to be an attempt to do the murder which was actually accomplished. If the ineffectual attempt to commit the murder in the earlier part of the day is to be treated

as a part of and merged in the later successful attempt, then, if by chance the slayer should be acquitted of the offense of murder, he would necessarily be acquitted of the assault with intent to murder of which he was guilty in the earlier part of the day. Let it be said that the circumstances were such as to actually justify the homicide, the acquittal for murder would necessarily follow, but it ought never be held that the acquittal for murder would operate as a bar to a prosecution for the separate offense of assault with intent to murder, which was committed in the morning.

In the case of Davis v. State, 45 Ark. 464, it was held that "under an indictment for murder the accused may be convicted of assault with intent to kill, provided the indictment contains all the substantive allegations necessary to let in proof of the inferior crime, and the proof shows that the offense of which he was convicted, and the one charged in the indictment, are the same." In that case the trial judge charged the jury: "If you believe from the evidence that the defendant, in September, 1883, went to the office of the deceased in Garland county, Arkansas, and there assaulted him with a deadly weapon, a loaded gun, by pointing it at him and demanding money, and did then shoot at the deceased with said gun, with intent to kill him, but that the shot so fired by the defendant missed the deceased, you will find the defendant guilty of an assault with intent to kill and murder, although you may find that the defendant, after firing such shot, really and in good faith abandoned the conflict, and retreated to a place of apparent safety, and there shot and killed the deceased, in order to save his own life, or to protect himself from great bodily injury." Upon review, the Supreme Court of that State held: "Another limitation upon the doctrine of convicting for a lower offense, upon an indictment charging a higher one of the same class, is the duty of the State to prove the identity of the two offenses. A conviction can not be had upon evidence of another offense of the same kind, committed on the same day, but not identical with it. Comm. v. Blood, 4 Gray, 31; Same v. Dean, 109 Mass. 349. The charge of the court implies that there was evidence of two distinct assaults—one unsuccessful, the defendant having missed his aim; and that he then withdrew from the conflict and retired in good faith to a place of apparent security, whither he was pursued by Adams, and was there attacked

in a manner to endanger his life, or menace him with great bodily harm, and that in defending himself he took the life of Adams. We are not advised of the interval of time that separated the two assaults, but we infer they did not constitute one continuous transaction, although they were doubtless so closely connected that the first assault was the cause of Adams' pursuit. Now, it was the last assault committed by the defendant which resulted in the death of Adams, that was the subject of this indictment. But from all guilt in the making of this assault, the jury, by their verdict have absolved the defendant. They have said that it was done in necessary self-defense, and was therefore justifiable. But they have recurred to the original attack upon Adams, which was not the ground of accusation and upon which no issue was joined, and have declared that it was murderous in design, notwithstanding it failed of execution. The defendant has been acquitted of the felonious homicide. The verdict finding him guilty of assault with intent to kill, if intended to apply to the later assault, in the course of which Adams lost his life, is not reconcilable with common sense; for that was either murder or manslaughter or excusable homicide. If it was meant to apply to a previous unsuccessful attempt to take the life of Adams, that was not the offense for which the prisoner was on trial. Doubtless he was, and still is, amenable to prosecution and punishment for that assault; but he must be indicted for it." See, also, in connection with Davis *v.* State, supra, the case of *Jackson* v. *State, 87 Ga.'*432, and cit. It may be that the defendant is guilty of an independent assault with intent to commit a murder, in which the actual perpetrator did not participate either in design or by relation in act, but, if so, for that offense he was not tried, and, consequently, could not be convicted.

A case may be easily supposed in which one person may be guilty of committing a murder by shooting, and another guilty of an assault with intent to murder by like means, both firing simultaneously upon the same person, and still with no such concurrence of act and intent as to render the one responsible for the act of the other. The homicide may involve the slaying of the same person, and yet the offense of each be entirely separate and distinct. Let us suppose that two persons with no common intent, but each with a similar purpose to slay another, lie in wait on opposite sides of

the way, each hidden from the other and neither knowing of the other's presence or purpose. The person slain passes along and is fired upon by one who misses his aim; the other immediately fires and kills such person. There is a single murder which one man has committed; the other did not participate in that homicide. Here, also, is an attempt to murder in which the murderer did not participate,—two distinct and separate offenses by separate persons and not in conspiracy. Certainly it could not be said that it would be proper to join both in one indictment, or proper to convict either for an offense based upon other than the particular criminal act which he perpetrated. As, in the case at bar, the defendant was indicted with the others charged with the criminal act which actually resulted in the death of the deceased, but, because there was evidence tending to show that although the defendant may not have participated in the act which really resulted in the death of the deceased, yet that he separately and independently from the others had committed certain other acts amounting to an assault with intent to murder, the court delivered the charge to which exception is taken as set forth in the excerpt. Under the present indictment, the charge was erroneous. If it is desired to put the defendant upon trial for the "separate and distinct" offense of assault with intent to murder, based upon the shot fired by the defendant before the mortal wound was inflicted by another, let him be so indicted as to charge him with that particular assault, and not the different act which resulted in the death. Here are two separate and distinct felonies; yet the judge charges the jury, that, two persons being jointly indicted for the murder, they may convict the defendant who made the ineffectual effort to slay, though they should find that he took no part in the commission of the homicide. For the reasons indicated, the judgment of the court below in refusing a new trial must be reversed. What has been said also disposes of the assignments of error in the 9th, 10th, 12th, and 13th grounds of the amended motion.

There were other assignments in the motion for new trial, which will now be dealt with. Complaint is made that the judge charged the jury the law in reference to principal in the first degree and principal in the second degree, and read in connection therewith that portion of § 42 of the Penal Code defining what constitutes constructive presence. There was some evidence authorizing in-

structions as to the law of principals in the first and second degrees, but as there was no evidence as to constructive presence, it would have been better if the presiding judge had omitted that part of the section relating to this subject. Complaint is made that the court charged the jury as follows: "Now if you should find from the evidence in this case and under the rules of law that I have given you, and will hereafter give you, that the defendant now on trial was not the principal in the first degree, that is, the actor or absolute perpetrator of the crime, then, before he could be convicted, you must believe beyond a reasonable doubt, from the evidence, that he was present, and that he either assisted in its commission, or that he shared in the criminal intent of the actor or absolute perpetrator of the crime, before you would be authorized to find him guilty of murder." This charge was excepted to upon the ground that it contained expression of opinion that the person who did the killing was guilty of a crime and that crime was murder, and also upon the ground that that portion of it which charged that the defendant would be guilty if he shared in the criminal intent of the actor or absolute perpetrator of the crime was error, and that there was no evidence to sustain the charge. There was some evidence to authorize the charge on the subject of principals in the first and second degrees, and the charge complained of does not contain any expression of opinion, but it is subject to the objection that the jury were instructed that the defendant would be guilty if he shared in the criminal intent of the actor or absolute perpetrator of the crime, even though he had been guilty of no overt act. This was, of course, error, and would of itself be a sufficient reason for reversing the judgment. There was some evidence authorizing the charge on the subject of conspiracy. The charges complained of in the 4th, 5th, 6th, 7th, and 8th grounds of the amended motion are not erroneous for any reasons assigned. Whether they were subject to any other criticism is not now for determination. As we have reached the conclusion that there was at least some slight evidence to authorize an instruction on the law relating to principals in the second degree, it necessarily follows that it was permissible to introduce in evidence the bill of indictment against Hardy Moss, with the verdict of guilty thereon. If the State relied upon the theory that Moss was the actual perpetrator of the crime and that the accused was

a principal in the second degree, it was absolutely essential that the State should prove that Hardy Moss was guilty of the offense charged as a principal in the first degree. This can be done by showing his indictment and conviction, which establishes his guilt prima facie as against the accused.

The foregoing discussion deals in substance with all of the assignments of error contained in the motion for new trial, and upon another trial the judge can so frame his charge as to avoid the errors which have been pointed out and adjust his instructions to the evidence as it may then appear, if it should be substantially different from what it was on the former trial.

*Judgment reversed. All the Justices concur, except Fish, C. J., absent.*